UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GWENDOLYN CLARK,

                    Plaintiff,

        -against-

HEMPHILL ARTWORKS, LLC d/b/a
HEMPHILL FINE ART, GEORGE
HEMPHILL, MNUCHIN GALLERY, LLC,
JOHN DOES 1-5, and ABC CORPS. 1-5,

                    Defendants,

"DOGWOOD BLOSSOM ALONG
SKYLINE DRIVE," 1973, oil on canvas (60
x 54 in), by Alma Thomas,

                    Defendant-in-rem.

**ORDER**

22 Civ. 7537 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

           In this diversity action, Plaintiff Gwendolyn Clark seeks a declaration that she has

a 50% ownership interest in an Alma Thomas painting entitled "Dogwood Blossom Along

Skyline Drive" (the "Painting" or the "Artwork"). The Painting is named as Defendant-in-rem.

(Cmplt. (Dkt. No. 1) ¶¶ 1, 47-50) The Complaint also asserts claims for (1) replevin against

Defendants Hemphill Artworks, LLC d/b/a Hemphill Fine Art ("HFA"), George Hemphill

(collectively the "Hemphill Defendants"), and the Mnuchin Gallery, LLC (id. ¶¶ 1, 51-57); and

(2) conversion, fraud, and unjust enrichment against certain Defendants premised on how they

allegedly came into possession of the Painting in 2019. (Id. ¶¶ 58-75)

           Defendants HFA, Hemphill, and Mnuchin Gallery have moved to dismiss on a

variety of grounds, including laches and failure to state a claim. (See Hemphill Br. (Dkt. No. 23)

at 9; Mnuchin Br. (Dkt. No. 28) at 6)[1]  For the reasons stated below, Defendants' motions to

dismiss will be granted (1) on laches grounds; and (2) for failure to state a claim, except as to

Plaintiff's bad faith conversion claim against HFA and Mnuchin.

**BACKGROUND**

I.    **FACTS**

    A.    **The 1976 Acquisition of the Painting**

        Plaintiff Clark is a Virginia resident.  She married her late husband, Wallace

Clark, in 1970.  (Clark Aff. (Dkt. No. 34) ¶¶ 2-3)

        On May 12, 1976, Plaintiff and her husband purchased "Dogwood Blossom

Along Skyline Drive," a painting created by the artist Alma Thompson in 1973.  (Clark Aff., Ex.

C (Dkt. No. 34-3) at 3-4)  The Clarks purchased the Painting from the Franz Bader Gallery in

Washington, D.C., for $3,500.  (Cmplt. (Dkt. No. 1) ¶ 13; Clark Aff., Ex. A (Dkt. No. 34-1) at 2)

They agreed to make an $800 down payment and to make monthly payments of $300 until the

total purchase price was paid.  (Clark Aff. (Dkt. No. 34) ¶ 6)

        According to Plaintiff, at some point after the Clarks purchased the Painting, their

marriage began to deteriorate.  Mr. Clark "stopped contributing financially to everything in

[their] life," and Plaintiff was "forced to pay the bulk of the purchase price [of the Painting]."

(Id.)  Plaintiff says that she did not make full payment until sometime after 1978.  (Id. ¶ 7)

---

[1]  The page numbers of documents referenced in this order correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

The Clarks "permanent[ly] separat[ed]" in 1981.  The Complaint does not specify whether the Clarks legally separated or simply lived apart.  (Id. ¶ 9)[2]

"[I]n the fall of 1981," "as the marriage began to deteriorate, Plaintiff's husband removed the [Painting] from the marital home without Plaintiff's permission."  (Cmplt. (Dkt. No. 1) ¶ 17)  Plaintiff further states that

> [s]hortly thereafter, given the futility of the prior restraining orders and out of fear for myself and my daughter, I had no choice but to flee the marital home with her on November 10, 1981.  The following day I retained the law firm Roundtree, Knox, Hunter & Parker, to bring an action against Wallace for custody of Erika, child support, injunctive relief, and the return of the paintings and prints.  That action resulted in the entry of a Consent Order dated February 19, 1982 . . . that permitted me to reside in the marital home and required Wallace to pay monthly support and maintenance, among other things.

(Clark Aff. (Dkt. No. 34) ¶¶ 12-13)

Defendants have submitted a copy of a February 18, 1982 Consent Order entered by the Superior Court of the District of Columbia, Family Division, in the action of Gwendolyn Clark v. Wallace Clark, Civil Action No. D 03632-8.  The Consent Order addresses Gwendolyn Clark's "motion for separate maintenance and child support."  (Consent Order (Dkt. No. 24-1) at 2)  The Consent Order awards Gwendolyn Clark "use and enjoyment of the marital home" and "custody of the [couple's] minor child," and directs Wallace Clark to make bi-weekly maintenance and child support payments.  (Id. at 3)

The Consent Order further states that

> Plaintiff agrees to return to the marital home certain paintings owned jointly by the parties, and further agrees not to remove any of the jointly held personal property from the marital home.

(Id. at 2)  The Consent Order later directs that

---

[2]  Plaintiff says that Mr. Clark abused her "physically, emotionally, and psychologically."  She obtained multiple orders of protection requiring her husband to leave their home, but once "the order would expire, [Mr. Clark] would return home and the abuse would continue."  (Id. ¶¶ 9-11)

Plaintiff shall return the paintings taken from the said marital home, and shall not further remove any of the jointly-owned personal property from the marital home.

(Id. at 3)

In the instant action, Plaintiff contends that the Consent Order's repeated references to "Plaintiff" returning the paintings to the marital home are "typographical error[s]." According to Plaintiff, the Superior Court judge intended that Wallace Clark – the defendant in the Superior Court action – be directed to return the paintings to the marital home.   (Clark Aff. (Dkt. No. 34) ¶ 13)[3]

The Consent Order does not mention the Painting by name or description; it refers only to "certain paintings owned jointly by the parties."  (Consent Order (Dkt. No. 24-1) at 3) Moreover, the Consent Order does not make any determination as to the ultimate disposition of the "paintings owned jointly by the parties" or any other "jointly held personal property."  The direction to return the paintings to the marital home is merely pendente lite.  (Id.)

In any event, the Complaint alleges that Wallace Clark never returned the paintings to the marital home, and that "Plaintiff had almost no contact with her abusive husband after their [1981] separation."  (Cmplt. (Dkt. No. 1) ¶ 18)  Plaintiff further states that after the issuance of the February 18, 1982 Consent Order, "it still took over a year before Wallace left the marital home."  (Clark Aff. (Dkt. No. 34) ¶ 14)  According to Plaintiff, she "spent approximately two years displaced from [her] home during which time [she] had to move in with

---

[3]  In support of this argument, Plaintiff has submitted a September 20, 2019 letter from Darrel Parker, her lawyer in the 1982 Superior Court action.  (Clark Aff., Ex. B (Dkt. No. 34-2)  In his letter, Parker states that the Consent Order contains a "scrivener's error."  The sentences in the Consent Order directing that "Plaintiff shall return the paintings taken from the said marital home" should instead reference "Defendant," because "[i]t was the Defendant, Wallace Clark, not the Plaintiff, Gwendolyn Clark, who removed the jointly held paintings and who was ordered to return them to the marital home."  (Id. at 2) That, of course, is not what the Consent Order says.

[her] sister, as well as with a friend before renting a townhouse[,] because [she] had no idea
when [she] could safely go back home with [her] young daughter."  (Id.)

### B.     The 1983 Sale of the Painting

On October 25, 1983, Wallace Clark sold the Painting to the Franz Bader Gallery
– the gallery that had originally sold the Painting to the Clarks – for $5,500.  (Clark Aff., Ex. H
(Dkt. No. 34-8) at 3)  The Complaint alleges that the sale of the Painting was "[u]nbeknownst to
Plaintiff and without her permission."  (Cmplt. (Dkt. No. 1) ¶ 22)  Plaintiff claims that "it was
not until May 2022" that she learned about the 1983 sale of the Painting.  (Clark Aff. (Dkt. No.
34) ¶ 43)

Plaintiff and Defendants have not provided an explanation of what became of the
Painting after the 1983 sale to the Franz Bader Gallery.

### C.     Plaintiff's Search for the Painting

After the Clarks' 1981 separation, Wallace Clark "relocated to Daytona Beach,
Florida."  (Clark Aff. (Dkt. No. 34) ¶ 22)  He died in 2008.  (Cmplt. (Dkt. No. 1) ¶ 21)
According to Plaintiff, she and Wallace Clark "were never divorced" – despite their lengthy
separation – and Wallace Clark left "no will or formal estate."  (Clark Aff. (Dkt. No. 34) ¶ 22)
Plaintiff states that while Wallace Clark was alive, she "was certain that her husband still had
possession of the [Painting]," because the Painting had "great sentimental value . . . to her
husband."  (Cmplt. (Dkt. No. 1) ¶ 20)[4]

---

[4] While Plaintiff states that she "did not think Wallace would sell or dispose of the [Painting],"
she also asserts that, after his death, she "began frequenting galleries in Washington, D.C. . . . out
of sheer hope that [she] would locate the [Painting]"  (Clark Aff. (Dkt. No. 34) ¶ 20)  She was
not able to locate the Painting, however, which "seemed to confirm that Wallace still possessed
the [Painting]" at the time of his death.  (Id.)

During the 26 years that passed between the February 18, 1982 Consent Order and Wallace Clark's 2008 death, Plaintiff made no effort to recover the Painting from her husband.  She provides the following explanation for her failure to make any effort to recover the Painting:

> Given his history, Wallace's non-compliance with the Consent Order was not surprising, but I thought I had least done my part by obtaining the order.  More importantly, Wallace was finally out of my life, and I felt that I could live without fear that he would severely injure or kill me or hurt our daughter.
>
> Moreover, he did periodically send money for child support.  Not the amount he was supposed to, but I was not about to jeopardize the small amount of support I was finally getting.  Under the circumstances, and finally living peacefully with custody of our daughter, I felt it would be extremely foolish and dangerous for me to pursue Wallace for the Work.
>
> Plus, Wallace, who was a musician and Director of the Music Program at the Duke Ellington School of the Arts in Washington, DC, loved the Work and when we originally purchased the Work our intentions were to always be with it.
>
> Also, even though he was a violent and troubled man, I did not think Wallace would sell or dispose of the Work (or would have been able to) while he was subject to a Court Order requiring that the Work be returned to our home.
>
> Lastly, as a single mother surviving on a teacher's salary in the 1980s, I could not afford to hire a lawyer every time Wallace should have been held accountable.

(Clark Aff. (Dkt. No. 34) ¶¶ 15-19)

When Wallace Clark died in 2008, Plaintiff asked her daughter – Erika Clark – to search Wallace Clark's home for the Painting.  (Cmplt. (Dkt. No. 1) ¶ 21)  Erika did not find the Painting in her father's home.  (Id.)

After determining that the Painting was not among Wallace Clark's possessions at his home, Plaintiff "continued to inquire about the Work when [she] would visit art galleries without any luck."  (Clark Aff. (Dkt. No. 23) ¶ 23)  Plaintiff also "conducted internet searches to gather some leads as to the whereabouts of the Work," which also "proved fruitless."  (Id. ¶ 26)

In January 2016, Plaintiff "toured a group exhibition [at Hemphill Fine Arts] that contained a piece by Alma Thomas."  While viewing the exhibition, Plaintiff met Mary Early, a senior staff assistant at Defendant Hemphill Fine Arts.  (Id. at 23; see also Cmplt. (Dkt. No. 1) ¶ 25)  Plaintiff "shared the story of the Artwork and how it was improperly taken from her," and Early "offered to help."  (Cmplt. (Dkt. No. 1) ¶ 25)  Among other things, Early "informed Plaintiff that the Franz Bader Gallery archives are available at the Smithsonian American Art Museum" (the "Smithsonian").  (Id.)  A few months later, Early informed Plaintiff that while she had "found no public records" concerning the Painting, she had located "copies of [Smithsonian] archival material pertaining to the Artwork."  (Id. ¶ 26; Clark Aff., Ex. C (Dkt. No. 34-3) at 2)[5]

Plaintiff "visit[ed] the [Smithsonian] archives [in] late 2018" and found an "unsigned statement" dated October 25, 1983 "documenting a $5,500 payment to Wallace [Clark] for the Work from the Franz Bader Gallery."  (Cmplt. (Dkt. No. 1) ¶ 27; Clark Aff. (Dkt. No. 34) ¶ 25; Clark Aff., Ex. D. (Dkt. No. 34-4) at 2)  "[T]he signature line for Wallace on this document was blank," however.  Plaintiff now says that the absence of a signature suggested to her that "Wallace had not gone through with the sale."  (Clark Aff. (Dkt. No. 34) ¶ 25)

At about the time that Plaintiff was researching the Smithsonian archives in 2018, her daughter Erika "learned from an online search that the Artwork had been offered for auction in June 1990 at Weschler's Auction House in the Washington, DC area, but had not been sold."  (Cmplt. (Dkt. No. 1) ¶ 29)  Plaintiff contacted the auction house, but was "told that at the time of

---

[5]  The archival materials submitted by Plaintiff in connection with the instant action indicate merely that the Painting was at one time in the possession of the Franz Bader Gallery.  (Clark Aff., Ex. C (Dkt. No. 34-3) at 3-4)  These materials do not indicate when or to whom the Franz Bader Gallery sold the Painting.  (Id.)

the auction in 1990, the auction house records had not been digitized and consequently the

information about the Artwork is not . . . available."  (Id. ¶ 30)

> In a January 2019 letter to Erika Clark, Sukanya Rajaratnam, a partner at

Defendant Mnuchin Gallery, states that the gallery is "in the preliminary stages of organizing an

exhibition" of the work of Alma Thomas.  Rajaratnam further states that in the gallery's

> curatorial research, we learned that Alma Thomas's painting Dogwood Blossom,
> was once part of your father's collection.  If the painting remains with your
> family, we would love the opportunity to discuss it with you and perhaps make an
> appointment to view the work, at your convenience.

(Clark Aff., Ex. E (Dkt. No. 34-5) at 2)

> According to the Complaint, Erika "immediately" contacted the Mnuchin Gallery

and

> informed them that the Artwork was never just in her father's collection, rather it
> was in her father's and mother's collection, as they had purchased it together.  She
> relayed that her father had taken the Artwork from the family home without her
> mother's consent and her mother had been looking for the Artwork for many,
> many years.
>
> 32.  Plaintiff's daughter communicated to MNUCHIN that her father had died in
> 2008, nevertheless, she and Plaintiff were still seeking information about the
> whereabouts of the Artwork.  During the conversation, Plaintiff's daughter asked
> how they found her and was told that MNUCHIN has great researchers.  Upon
> hearing this, she asked if they could work together to find the Artwork but
> MNUCHIN refused to provide assistance.

(Cmplt. (Dkt. No. 1) ¶¶ 31-32) (emphasis in original)

> Later in January 2019, Plaintiff visited the Michael Rosenfeld Gallery in

Manhattan and "relayed her story about the Artwork to Michael Rosenfled."  (Id. ¶ 33)

Rosenfeld "suggested that Plaintiff register the Artwork with the Art Loss Register,"[6] and "said

---

[6]  The Art Loss Register is a London-based organization that "holds the world's largest private
database of lost, stolen and looted art, antiques and collectibles, currently listing more than

that he would notify the Plaintiff if he learned the whereabouts of the Artwork."  (Id.)  On

January 29, 2019, Plaintiff obtained "conditional registration for the Artwork from the Art Loss

Registry bearing registration number R00013028."  (Id. ¶ 34)  The registration was finalized on

April 26, 2019.  (Id. ¶ 35)

On August 27, 2019, the Art Loss Registry informed Plaintiff that "a painting by

Alma Thomas with the same title was searched by an art gallery in the United States."  (Id. ¶ 36)

On September 3, 2019, Michael Rosenfeld "informed [Plaintiff] that the Artwork was in New

York and was slated to open in an exhibition the following week" at the Mnuchin Gallery.  (Id. ¶

37)

On September 4, 2019, Erika Clark spoke with the Mnuchin Gallery's

Rajaratnam, who "apologized for not contacting her and offered to pull the Artwork from the

exhibition."  (Id. ¶ 38)  In a September 5, 2019 email to Rajaratnam, Erika states that she has

"spoke[n] to [her] mother, Gwen Clark, and she would in fact like to request that the Alma

Thomas piece Dogwood Blossom Along Skyline Drive be removed from your upcoming show."

(Clark Aff., Ex. F (Dkt. No. 34-6) at 2)

That same day, Plaintiff went to Hemphill Fine Arts in Washington, DC, "to

thank Mary Early for her support over the years and to inform her that the Artwork had surfaced

in New York."  (Cmplt. (Dkt. No. 1) ¶ 39)  The Complaint alleges that while Plaintiff was at

HFA, she had the following exchange with Early and Defendant Hemphill:

> 39. . . . [Early] and [George] HEMPHILL informed Plaintiff that they were
> advised by their lawyer not to talk with her but given that they knew the Plaintiff
> they wanted to "come clean."  HEMPHILL then informed Plaintiff that HFA
> actually sold the Artwork and subsequently consigned it to MNUCHIN.

---

700,000 items."  About Us, The Art Loss Register (last visited Mar. 15, 2024), available at
https://www.artloss.com/about-us/.

40.  Plaintiff was speechless, as she thought HFA and HEMPHILL had been actively trying to help her recover the Artwork.  When pressed about the Artwork, HEMPHILL said that a long-time client came to him in June 2019 requesting assistance in selling the Artwork and that his client informed him that he had acquired the painting in the late 70s and it was titled "Leaves over Shenandoah." However, HEMPHILL admitted that when he examined the Artwork after it arrived at HFA, he saw that it bore the title of the Artwork "Dogwood Blossom Along Skyline Drive" on the verso.

41.  When Plaintiff asked HEMPHILL what his client presented as proof of ownership of the Artwork, he hesitated and said, "He showed me something on a brown piece of paper."  After Plaintiff pointed out that the Artwork had not left her home until the early 1980s, HEMPHILL changed the date and simply said it was a "colorful story."

42.  HEMPHILL repeatedly refused to provide Plaintiff with clear and accurate information about the Artwork, which he is clearly in possession of, and refused to provide Plaintiff with the identity of the possessor citing client confidentiality.

(Cmplt. (Dkt. No. 1) ¶¶ 39-42)

On September 9, 2019, Erika Clark "received correspondence from an attorney claiming to represent the anonymous lender of the Artwork" to the Mnuchin Gallery.  (Id. ¶ 44) The attorney claimed that the client had "clear title to the Artwork" and had "purchased it from HFA."  (Id.)

Plaintiff, George Hemphill, and the lawyer for the anonymous purchaser of the Painting engaged in settlement discussions between October 2019 and June 2020 (Clark Aff., Ex. G (Dkt. No. 34-7) at 2-8; Clark, Aff., Ex. I (Dkt. No. 34-9) at 2; Clark Aff. (Dkt. No. 34) ¶ 47), but those negotiations were unsuccessful.  (Cmplt. (Dkt. No. 1) ¶¶ 45-46)

In the Complaint, Plaintiff states that she "does not know the identity of the current possessor" of the Painting.  (Id. ¶ 46)

II.   **PROCEDURAL HISTORY**

The Complaint was filed on September 2, 2022, and seeks a declaration that Plaintiff holds a 50% interest in the Painting.  (Cmplt. (Dkt. No. 1) ¶ 50)  The Complaint also

asserts claims for (1) replevin against HFA, George Hemphill, and Mnuchin Gallery; and (2) conversion against HFA and Mnuchin Gallery; (3) fraud and fraudulent concealment against Hemphill and HFA arising out of their "fail[ure] to disclose to the Plaintiff that they knew the identity of the possessor, had sold the Artwork, and then subsequently consigned it to [the Mnuchin Gallery]" in 2019; and (4) unjust enrichment against HFA and the Mnuchin Gallery arising out of their sale of the Painting in 2019.  (Id. ¶¶ 51-75)

Defendants HFA and Hemphill moved to dismiss on January 12, 2023 (Dkt. No. 22), and Mnuchin Gallery moved to dismiss on January 30, 2023.  (Dkt. No. 27)

On April 6, 2023, Plaintiff filed an opposition to Defendant's motions and a cross-motion to amend.  (Dkt. Nos. 33, 35)  Defendants filed reply briefs on April 26, 2023. (Dkt. Nos. 26, 31)

## DISCUSSION

Defendants HFA, Hemphill, and Mnuchin Gallery argue that the Complaint should be dismissed on a variety of grounds, including laches and failure to state a claim. (Hemphill Br. (Dkt. No. 23); Mnuchin Br. (Dkt. No. 28))[7]  (Hemphill Br. (Dkt. No. 23) at 12-17)

---

[7]  The Hemphill Defendants also contend that this Court lacks subject matter jurisdiction and personal jurisdiction over them.  (Hemphill Br. (Dkt. No. 23) at 12-17)  As to subject matter jurisdiction, the Complaint alleges diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). (Cmplt. (Dkt. No. 1) ¶ 3)  HFA and Hemphill assert that Plaintiff has not alleged complete diversity, because the Complaint does not state the citizenship of the members of Defendants Hemphill Artworks, LLC and Mnuchin Gallery, LLC.  (Hemphill Br. (Dkt. No. 23) at 15)

In a November 22, 2022 letter, however, Plaintiff represents that

> Defendant George Hemphill is the sole member of Defendant Hemphill Artworks, LLC.  George Hemphill is a resident citizen of Washington, DC.  Upon information and belief, Robert Mnuchin is the sole member of Defendant Mnuchin Gallery, LLC, and a resident citizen of New York, Connecticut, and/or Florida.

(Dkt. No. 13)  Given that the Complaint alleges that Plaintiff is a citizen of Virginia (Cmplt. (Dkt. No. 1) ¶ 3), the record indicates that there is complete diversity.

As to personal jurisdiction, the Complaint alleges that Hemphill is a Washington, D.C. resident and that HFA is incorporated in D.C. and maintains a principal place of business there.  (Id. ¶¶ 8, 9)  HFA and Hemphill contend that Plaintiff has not pled facts sufficient to justify this Court's exercise of personal jurisdiction over them under New York's long-arm statutes, C.P.L.R. §§ 301 and 302(a)(1).  (Hemphill Br. (Dkt. No. 23) at 12-15)

To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff "'must make a prima facie showing that jurisdiction exists,'" which "'entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction.'"  Charles Schwab Corp. v. Bank of America Corp., 883 F.3d 68, 81 (2d Cir. 2018) (alteration removed) (quoting Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010)).  "On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the Court may look beyond the four corners of the complaint and consider all pleadings and accompanying affidavits and declarations, while still 'resolving all doubts in [the non-movant's] favor.'"  Everlast World's Boxing Headquarters Corp. v. Ringside, Inc., 928 F. Supp. 2d 735, 737 n.1 (S.D.N.Y. 2013) (quoting DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001)).

Under New York C.P.L.R. § 302(a)(1), personal jurisdiction is proper over a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state."  Section 302(a)(1) is a "'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988).  In determining what constitutes a "transaction of business," "the quality of the defendants' New York contacts . . . is the primary consideration."  Fischbarg v. Doucet, 9 N.Y.3d 375, 380 (2007).  For a defendant's contacts to be "purposeful," the defendant "must commit an act by which it 'purposefully avails itself of the privilege of conducting activities within [New York].'"  Paterno v. Laser Spine Inst., 24 N.Y.3d 370, 377 (2014) (brackets  in original) (quoting Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 508 (2007).

Here, the Complaint alleges that on September 5, 2019, Hemphill "informed Plaintiff that HFA [had] . . . sold the Artwork and subsequently consigned it" to Defendant Mnuchin Gallery in New York City for display at an exhibition related to Alma Thomas.  (Cmplt. (Dkt. No. 1) ¶¶ 37, 39)  And in her affidavit, Plaintiff asserts that "George Hemphill admitted to me that he sold the work in 2019, and then represented the new possessor in consigning the Work to Mnuchin."  (Clark Aff. (Dkt. No. 34) ¶ 41)  HFA and Hemphill do not contest that they assisted with the new owner's "consignment of the painting" to Mnuchin Gallery.  (Hemphill Reply (Dkt. No. 26) at 11)  In other words, it appears undisputed that Hemphill and HFA assisted the Painting's buyer in negotiating with Mnuchin Gallery concerning a consignment of the Painting to the Mnuchin Gallery in connection with the gallery's Alma Thomas exhibition in New York City.  These facts

# I.    **STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

In considering a Rule 12(b)(6) motion to dismiss, a district court "accept[s] all factual claims in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor." Lotes Co. v. Hon Hai Precision Industry Co., 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks and citation omitted).  This tenet, however, is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  Rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . i.e., enough to make the claim plausible." Arista Records LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted).  A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." Twombly, 550 U.S. at 558.

Moreover, "'a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.'" Whiteside v. Hover-

_____

are sufficient to permit this Court to exercise personal jurisdiction over Hemphill and HFA pursuant to New York C.P.R.L. § 302(a)(1).

<u>Davis, Inc.</u>, 995 F.3d 315, 319 (2d Cir. 2021) (quoting <u>Staehr v. Hartford Fin. Servs. Grp., Inc.</u>, 547 F.3d 406, 425 (2d Cir. 2008).  Such a motion may be granted "only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'"  <u>McKenna v. Wright</u>, 386 F.3d 432, 436 (2d Cir. 2004) (quoting <u>Citibank, N.A. v. K-H Corp.</u>, 968 F.2d 1489, 1494 (2d Cir. 1992)).

## II.   <u>LACHES</u>

According to Defendants, "Plaintiff knew of her alleged rights to the Artwork, if any, in 1981," but did not file the Complaint until September 2022.  "[S]uch inexcusable delay [caused] manifest prejudice to the defendants [so] as to warrant dismissal under the doctrine of laches."  (Mnuchin Br. (Dkt. No. 28) at 8; <u>see</u> <u>also</u> Hemphill Br. (Dkt. No. 23) at 14)

Plaintiff responds that she "did not unreasonably delay" in bringing this case. (Pltf. Opp. (Dkt. No. 35) at 16)  Plaintiff does not address Defendants' argument that they have been prejudiced as a result of her delay.

### A.   <u>Legal Standard</u>

Under New York law,[8] laches is "an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party."  <u>Saratoga Cnty. Chamber of Com., Inc. v. Pataki</u>, 100 N.Y.2d 801, 816 (2003).  "The mere lapse of time, without

---

[8]  Plaintiff and Defendant Mnuchin Gallery cite only to New York law.  (<u>See</u> Mnuchin Br. (Dkt. No. 23) at 11-24; Pltf. Opp. (Dkt. No. 35) at 14-26)  Hemphill and HFA also cite to New York law, but as to certain issues they cite to New York and to D.C. law in the alternative.  (Hemphill Br. (Dkt. No. 23) at 12-33)

By citing to New York law, the parties have consented to this Court's application of New York law in resolving Defendants' motions to dismiss.  <u>See</u> <u>Walter E. Heller & Co. v. Video Innovations, Inc.</u>, 730 F.2d 50, 52 (2d Cir. 1984); <u>Tehran-Berkeley Civ. & Env't Engineers v. Tippetts-Abbett-McCarthy-Stratton</u>, 888 F.2d 239, 242 (2d Cir. 1989) (finding "implied consent" to the application of New York law where "[t]he parties' briefs . . . rely on New York law").

a showing of prejudice, will not sustain a defense of laches."  Id.  "The defense has been applied

in . . . declaratory judgment actions [such as this] . . . where the defendant shows prejudicial

delay. . . ."  Id.

   In the context of lost or stolen artwork, both a "lack of diligence in searching" for

the missing artwork as well as "unreasonable delay in making a demand upon a known

possessor" are relevant to a laches defense.  Solomon R. Guggenheim Found. v. Lubell, 153

A.D.2d 143, 149 (1st Dep't 1990), aff'd, 77 N.Y.2d 311 (1991); see also Matter of Peters v.

Sotheby's, 34 A.D.3d 29, 37 (1st Dep't 2006) ("[T]he degree of diligence exercised by the true

owner in attempting to locate the stolen property and identify its owner . . . is pertinent in the

context of a laches defense."); Wertheimer v. Cirker's Hayes Storage Warehouse, Inc., 300

A.D.2d 117, 118 (1st Dep't 2002) (finding a "lack of due diligence in seeking the return of [a]

painting" where, "for nearly half a century prior to the commencement of this action . . .

[plaintiffs] failed to take any steps to recover the painting"); Zuckerman v. Metro. Museum of

Art, 928 F.3d 186, 192-94 (2d Cir. 2019) (applying New York law; finding that plaintiff's "delay

. . . was unreasonable" where "over seventy years passed between the sale of the painting" to a

French art dealer in 1938 and Plaintiff's 2010 demand for the painting's return from its eventual

owner, the Metropolitan Museum of Art)

   The "essential element" of laches is delay that is "prejudicial to the opposing

party."  In re Barabash's Est., 31 N.Y.2d 76, 81 (1972)  Courts have found prejudice where a

plaintiff's delay has resulted in "'deceased witness[es], faded memories, . . . and hearsay

testimony of questionable value,' as well as the likely disappearance of documentary evidence."

Zuckerman, 928 F.3d at 194 (quoting Lubell, 153 A.D.2d at 149); see also Williams v. Nat'l

Gallery of Art, London, No. 16-CV-6978 (VEC), 2017 WL 4221084, at *13 (S.D.N.Y. Sept. 21,

2017), aff'd sub nom. Williams v. Nat'l Gallery, London, 749 F. App'x 13 (2d Cir. 2018)

(finding that defendants were prejudiced where "a significant amount of time – decades – ha[d]

passed since [a] Painting was allegedly stolen and since the National Gallery acquired the

Painting" and "[t]he delay [would] likely . . . make it difficult for the Defendants 'to garner

evidence to vindicate [their] rights'" (quoting Greek Orthodox Patriarchate of Jerusalem v.

Christie's, Inc., No. 98 CIV. 7664 (KMW), 1999 WL 673347, at *10 (S.D.N.Y. Aug. 30,

1999))).

   A laches defense "may be resolved as a matter of law" where "the original

owner's lack of due diligence and prejudice to the party currently in possession are apparent."

Peters, 34 A.D.3d at 38.  While "[t]he affirmative defense of laches is generally not appropriately

raised on a motion to dismiss, . . . 'when the defense of laches is clear on the face of the

complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the

insuperable bar, a court may consider the defense on a motion to dismiss.'"  Williams, 2017 WL

4221084, at *12 (quoting Lennon v. Seaman, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999); see also

Zuckerman, 928 F.3d at 192 (upholding dismissal premised on laches).  Stated another way, the

applicability of the affirmative defense of laches must be so clear and apparent from the face of

the complaint that it is appropriate to resolve the issue as a matter of law on a motion to dismiss.

Id. at *12; see Galin v. Hamada, No. 15 CV 6992(JMF), 2016 WL 2733132, at *2 (S.D.N.Y.

May 10, 2016) ("[A] court may grant a motion to dismiss based on an affirmative defense only

if, on the face of the complaint, the defense 'clearly' applies." (quoting Harris v. City of New

York, 186 F.3d 243, at 250 (2d Cir. 1999))).

  **B.**  **Analysis**

   Plaintiff claims that she has a 50% interest in the Painting and that her ownership

interest was violated when her late husband (1) "removed the Artwork from the marital home

without Plaintiff's permission" in 1981; (2) failed to return the Painting, in alleged violation of the 1982 Consent Order; and (3) re-sold the Painting to the Franz Bader Gallery in 1983 without her knowledge.  (Cmplt. (Dkt. No. 1) ¶¶ 17-18, 22)  Plaintiff's request for a declaratory judgment, and her replevin, conversion, fraud, and unjust enrichment claims, are all premised on the assertion that she held a 50% interest in the Painting, and that her husband violated her ownership rights in the early 1980s.

For the reasons explained below, the Court concludes that Plaintiff's nearly 40-year delay in asserting her claim of ownership in the Painting is not reasonable, and that Defendants have been prejudiced as a result of Plaintiff's delay.  Accordingly, dismissal on laches grounds is warranted.

### 1.   Unreasonable Delay

Twenty-six years passed between the issuance of the Consent Order in 1982 and Wallace Clark's death in 2008.  (Cmplt. (Dkt. No. 1) ¶¶ 18, 21)  Although Plaintiff states that she was "certain that her husband still had possession of the Artwork" during those twenty-six years, she made no effort to recover the Painting from him during that time.  (Id. ¶ 20)  Plaintiff states that it was not until her husband's death in 2008 – when she "instructed her daughter to look for the Artwork at her husband's home" – that she first took steps to recover the Painting.  (Id. ¶ 21)

Plaintiff seeks to excuse her twenty-six-year delay by referencing her husband's history of abuse, stating that she was "afraid of her husband and under duress."  (Id. ¶ 19)  Plaintiff also maintains that while her husband "never complied with the Consent Order[,] he would sporadically send small amounts of money to Plaintiff, which she desperately needed to survive."  (Id.)

On January 27, 1983, however, Plaintiff filed a motion in Superior Court of the District of Columbia seeking to have her husband held in contempt for his violations of the 1982

Consent Order.  (Moran Reply Decl., Ex. A (Dkt. No. 38) at 2)[9]  In her motion, Plaintiff states

that her husband "has failed to pay or hold plaintiff harmless on the current indebtedness owed to

Riggs National Bank."  Plaintiff's husband took on this obligation in the 1982 Consent Order.

(Id.; Consent Order (Dkt. No. 24-1) at 2)  In sum, in January 1983 Plaintiff chose to pursue legal

action against her husband concerning the provision of the 1982 Consent Order addressing a debt

owed to Riggs National Bank, but did not seek to enforce that part of the 1982 Consent Order

that she says required her husband to return the Painting.

       And while Plaintiff contends that she "spent over 25 years visiting art galleries in

Washington D.C. and making inquiries about the Artwork to no avail" (Cmplt. (Dkt. No. 1) ¶

23), to the extent that Plaintiff is claiming that she searched for the Painting in galleries prior to

her husband's death in 2008, any such assertion contradicts her representation that she was

"certain" during the twenty-six years preceding her husband's death that "her husband still had

possession of the Artwork."  (Id. ¶ 20)

       In any event, Plaintiff's vague allegations that she periodically "visit[ed] art

galleries" and "ma[de] inquiries" does not demonstrate "reasonable diligence" in searching for

the Painting.  See Sanchez v. Trustees of the Univ. of Pennsylvania, No. 04 CIV. 1253 (JSR),

2005 WL 94847, at *3 (S.D.N.Y. Jan. 18, 2004) (plaintiff's search was not diligent when "the

only things he did in the thirty-two years . . . were walking into the Metropolitan Museum of Art

(and, occasionally, other, unspecified galleries) to look for the Collection and asking two lawyers

he never retained, and some unspecified United Nations persons, about the Collection").  During

---

[9]  On a motion to dismiss, a court may take judicial notice of a document filed in another court
"'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of
such litigation and related filings.'"  Glob. Network Commc'ns, Inc. v. City of New York, 458
F.3d 150, 157 (2d Cir. 2006) (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger
U.S.A., Inc., 146 F.3d 66, 70 (2d Cir.1998).

her twenty-six years of delay, Plaintiff did not pursue the most obvious step towards recovering the Painting, which was to contact her husband, either directly or through the lawyer representing her in Superior Court in connection with the Consent Order.

In sum, the Complaint's allegations make clear that Plaintiff took no steps to recover the Painting during the twenty-six years that passed between the 1982 Consent Order and her husband's death in 2008, and that she failed to take action despite (1) being "certain" that her husband had the Painting in his possession; (2) the 1982 Consent Order which – according to Plaintiff – required her husband to return the Painting to the marital home; and (3) bringing a motion for contempt against her husband in 1983 concerning other aspects of the 1982 Consent Order.

Given these circumstances, the Court concludes that Plaintiff's delay in asserting her claim of ownership to the Painting is unreasonable.

### 2.     **Prejudice**

As noted above, Wallace Clark died in 2008.  (Cmplt. (Dkt. No. 1) ¶ 21)  He is thus unavailable to testify regarding the circumstances in which the Painting was purchased; whether and when he removed the Painting from the marital home; his understanding of the 1982 Consent Order; whether he ever returned the Painting to the marital home; whether he ever discussed the Painting with Plaintiff during their marriage and after their separation; and the circumstances under which he sold the Painting in 1983.

Moreover, the Franz Bader Gallery – which sold the Painting to Plaintiff and her husband in 1976, and which allegedly repurchased it from Wallace Clark in 1983 – is defunct. While the Complaint references certain alleged Franz Bader Gallery records that are now apparently in the custody of the Smithsonian (Cmplt. (Dkt. No. 1) ¶ 25), it appears likely – given

19

that forty years or more have passed since these transactions – that relevant documents bearing on Plaintiff's claim no longer exist.  Zuckerman, 928 F.3d at 194.

> The Court concludes that Defendants have been prejudiced as a result of Plaintiff's decades of delay in asserting her ownership interest in the Painting.

> Given Plaintiff's unreasonable delay in asserting her ownership interest in the Painting and the prejudice suffered by Defendants as a result of Plaintiff's unreasonable delay, Defendants' motion to dismiss on laches grounds will be granted.

## III.   FAILURE TO STATE A CLAIM

> Although Plaintiffs' claims fail on laches grounds, the Court considers below Defendants' arguments that the Complaint fails to state a claim.

### A.   Replevin

> The Complaint alleges a replevin claim against Hemphill, HFA, and the Mnuchin Gallery.  (Cmplt. (Dkt. No. 1) ¶¶ 51-57)

#### 1.   Legal Standard

> In an action for replevin, the plaintiff must "establish a superior possessory right in the chattel to that of the defendant."  Pivar v. Graduate Sch. of Figurative Art of the New York Acad. of Art, 290 A.D.2d 212, 213 (1st Dep't 2002) (citation omitted).  "A cause of action sounding in replevin must [also] establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right."  Se. Fin., LLC v. Broadway Towing, Inc., 117 A.D.3d 715, 715 (2d Dep't 2014) (citation and quotation marks omitted); Ball v. Cook, No. 11 CIV. 5926 RJS, 2012 WL 4841735, at *10 (S.D.N.Y. Oct. 9, 2012) ("[U]nder a replevin cause of action, . . . [p]laintiff is entitled to recover only the works still in [defendant's] possession, custody, or control.").

2.      **Analysis**

The Complaint does not allege that Defendants Hemphill, HFA, and Mnuchin Gallery possess the Painting.  Indeed, Plaintiffs states in the Complaint that she "does not know the identity of the current possessor."  (Cmplt. (Dkt. No. 1) ¶ 46)

Under the case law discussed above, this admission is fatal to Plaintiff's replevin claim.  Accordingly, Plaintiff's replevin claim against Hemphill, HFA, and Mnuchin Gallery will be dismissed pursuant to Rule 12(b)(6).

B.      **Conversion**

The Complaint alleges a conversion claim against HFA and the Mnuchin Gallery. (Cmplt. (Dkt. No. 1) ¶¶ 58-62)

1.      **Legal Standards**

a.      **Statute of Limitations**

Under New York law, claims for conversion are governed by a three-year statute of limitations.  N.Y. C.P.L.R. § 214(3).

"In New York, when a cause of action for conversion . . . accrues will depend on whether the current possessor is a good faith purchaser or bad faith possessor."  Wallace Wood Properties v. Wood, 117 F. Supp. 3d 493, 497 (S.D.N.Y. 2015).  In an action against a "bona fide purchaser," a plaintiff's cause of action "d[oes] not accrue" until the plaintiff "demanded the goods and [was] refused."  State v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 260 (2002). "[T]he statute of limitations for conversion . . . automatically begins to run against a bad faith possessor on the date of the theft or bad faith acquisition – even if the true owner is unaware the chattel is missing."  Grosz v. Museum of Mod. Art, 772 F. Supp. 2d 473, 481-82 (S.D.N.Y. 2010) (citing Close-Barzin v. Christie's, Inc., 51 A.D.3d 444, 444 (1st Dep't 2008).

Generally, "'[t]he lapse of a limitations period is an affirmative defense that a defendant must plead and prove.'" Whiteside, 995 F.3d at 319 (quoting Staehr, 547 F.2d at 425). However, "[a] court . . . may dismiss a claim on statute-of-limitations grounds at the pleadings stage 'if [the] complaint clearly shows the claim is out of time.'" Id. (quoting Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999)).

### b.    Elements of Conversion

Under New York law, "[c]onversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." Meese v. Miller, 79 A.D.2d 237, 242 (4th Dep't 1981). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 50 (2006) (citation omitted). "Neither a tortious taking nor bad faith is an element of the cause of action[, however]." Mut. Benefits Offshore Fund, Ltd. v. Zeltser, 172 A.D.3d 648, 652 (1st Dep't 2019).

Where "possession of the property is originally lawful, a conversion occurs when the defendant refuses to return the property after a demand. . . ." White v. City of Mount Vernon, 221 A.D.2d 345, 346 (2d Dep't 1995); Mut. Benefits Offshore Fund, 172 A.D.3d at 652 ("[A] lawful possessor cannot be charged with conversion until after a demand and refusal to return the property."). "[S]ince an innocent purchaser of stolen goods is not a wrongdoer, she is not liable in conversion unless and until she refuses the true owner's demand for a return of the property." Leveraged Leasing Admin. Corp. v. PacifiCorp Cap., Inc., 87 F.3d 44, 49 (2d Cir. 1996) (citing Lawrence v. Meloni, 163 A.D.2d 827, 828 (4th Dep't 1990)).

Where "the defendant holds the property unlawfully – where, for example, he stole the property – 'no demand and refusal are necessary to render the defendant liable'" for conversion.  Id. (citing Nat Koslow, Inc. v. Bletterman, 23 Misc. 2d 340, 343 (Sup. Ct. N.Y. Ctny. 1960).

### 2.   Analysis

The Complaint alleges that HFA and the Mnuchin Gallery are liable for conversion because they "bought, sold, transferred, consigned, and/or exhibited the Artwork after learning that Plaintiff claimed ownership and had been searching for the Artwork for many years."  (Cmplt. (Dkt. No. 1) ¶ 60)  The Complaint does not specify whether HFA or Mnuchin Gallery are liable for good faith or bad faith conversion.

As discussed below, to the extent that Plaintiff contends that HFA and the Mnuchin Gallery are liable for good faith conversion, she has not alleged the demand and refusal to return necessary to plead such a claim.  To the extent that Plaintiff intends to allege that HFA and the Mnuchin Gallery are liable for bad faith conversion, the facts currently in the record are not sufficient to permit this Court to conclude, as a matter of law, that Plaintiff's conversion claim is time barred.

#### a.   Good Faith Conversion

As discussed above, "a lawful possessor cannot be charged with conversion until after a demand and refusal to return the property."  Mut. Benefits Offshore Fund, 172 A.D.3d at 652.  Here, the Complaint does not plead – either as to HFA or the Mnuchin Gallery – that Plaintiff demanded the return of the Painting and that Defendants refused to provide it.

As to HFA, the Complaint alleges that during the September 5, 2019 meeting, Hemphill "repeatedly refused to provide Plaintiff with clear and accurate information about the Artwork, which he is clearly in possession of, and refused to provide Plaintiff with the identity of

the possessor citing client confidentiality." (<u>Id.</u> ¶ 42)  The Complaint does not allege, however, that Plaintiff asked the Hemphill Defendants to return the Painting, and that they refused to do so.

As to the Mnuchin Gallery, the Complaint alleges that after Plaintiff learned that the Painting was in the Mnuchin Gallery's possession, on September 4, 2019, "Plaintiff's daughter contacted MNUHCIN who apologized for not contacting her and offered to pull the Artwork from the exhibition.  Plaintiff's daughter responded that she would let the Plaintiff decide whether to pull the Artwork." (<u>Id.</u> ¶ 38)  "Plaintiff's daughter [subsequently] contacted MNUCHIN, informing them that her mother would like the matter resolved before any showing or sale of the Artwork." (<u>Id.</u> ¶ 40)  Once again, Plaintiff does not plead that she demanded that the Mnuchin Gallery return the Painting to her, and that the Mnuchin Gallery refused to do so.

Accordingly, to the extent that the Complaint alleges that HFA and the Mnuchin Gallery are liable for good faith conversion, Plaintiff has not pled the necessary element of demand and refusal.

### b.   <u>Bad Faith Conversion</u>

The Complaint was filed on September 2, 2022. (<u>Id.</u>)  Accordingly, if Plaintiff's conversion claim against HFA and the Mnuchin Gallery accrued prior to September 2, 2019, it is time-barred.

The Complaint alleges that HFA learned of Plaintiff's claim of ownership in the Painting in January 2016 (Cmplt. (Dkt. No. 1) ¶ 25), and that the Mnuchin Gallery was informed of Plaintiff's claim to the Painting in January 2019. (<u>Id.</u> ¶ 31)  According to the Complaint, Plaintiff learned on September 3, 2019 that "the Artwork was in New York and was slated to open in an exhibition the following week at MNUCHIN." (<u>Id.</u> ¶ 37) (emphasis in original). During a September 5, 2019 meeting, Hemphill told Plaintiff that "a long-time client came to

him in June 2019 requesting assistance in selling the Artwork," and that HFA later "sold the Artwork and subsequently consigned it to MNUCHIN."  (Id. ¶¶ 39, 40) (emphasis in original). The Complaint does not disclose when (1) HFA sold the Painting; or (2) when HFA consigned the Painting to the Mnuchin Gallery.

While it appears likely that HFA sold the painting prior to September 2, 2019, and consigned it to the Mnuchin Gallery before that date, that cannot be determined as a matter of law based on the facts currently in the record.  Accordingly, to the extent that the Complaint is read to allege that HFA and the Mnuchin Gallery came into possession of the Painting in bad faith, it is not clear as a matter of law that Plaintiff's conversion claim is time-barred.[10]

For the reasons discussed above, Plaintiff's conversion claim against HFA and Mnuchin is dismissed pursuant to Rule 12(b)(6) to the extent it is premised on a theory of good faith conversion.  To the extent that Plaintiff's conversion claim is premised on a theory of bad faith conversion, it is not subject to dismissal under Rule 12(b)(6).

### C.   **Fraud**

The Complaint alleges a fraud claim against Hemphill and HFA.  (Cmplt. (Dkt. No. 1) ¶¶ 63-72)

---

[10]  The Hemphill Defendants argue that the conversion claim against HFA also fails because Plaintiff has not pled facts showing "that she has a superior right of ownership" in the Painting vis-à-vis HFA, in that Plaintiff only pleads that she owns a "50% interest in the Artwork." (Hemphill Br. (Dkt. No. 23) at 27)

Plaintiff alleges, however, that her 50% ownership stake in the Painting includes a right of physical possession.  (Cmplt. (Dkt. No. 1) ¶ 49)  And the Hemphill Defendants have not cited case law demonstrating that Plaintiff's alleged 50% ownership stake in the Painting is insufficient to permit her to assert a conversion claim.

### 1.    **Legal Standard**

"To state a legally cognizable claim of fraudulent misrepresentation, the complaint must allege that the defendant made a material misrepresentation of fact; that the misrepresentation was made intentionally in order to defraud or mislead the plaintiff; that the plaintiff reasonably relied on the misrepresentation; and that the plaintiff suffered damage as a result of its reliance on the defendant's misrepresentation." P.T. Bank Cent. Asia v. ABN AMRO Bank N.V., 301 A.D.2d 373, 376 (1st Dep't 2003). "A cause of action for fraudulent concealment requires, in addition to the four foregoing elements, an allegation that the defendant had a duty to disclose material information and that it failed to do so." Id.

"A duty to disclose may arise where there is a fiduciary or confidential relationship." Barrett v. Freifeld, 77 A.D.3d 600, 601–02 (2d Dep't 2010); see also Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 179 (2011) ("[W]ith respect to a claim of fraudulent omission, the complaint fails to allege that [defendant] owed a fiduciary duty to [plaintiff]"). Alternatively, "[u]nder the 'special facts' doctrine, a duty to disclose arises 'where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.'" Swersky v. Dreyer & Traub, 219 A.D.2d 321, 327 (1st Dep't 1996) (quoting Beneficial Com. Corp. v. Murray Glick Datsun, Inc., 601 F. Supp. 770, 773 (S.D.N.Y. 1985))

### 2.    **Analysis**

With respect to the fraud claim against HFA and Hemphill, the Complaint alleges that in January 2016, Plaintiff met "Mary Early, a Senior Staff Assistant at HFA," and that Plaintiff "shared the story of the Artwork and how it was improperly taken from her." (Cmplt. (Dkt. No. 1) ¶ 25)  Early "offered to help Plaintiff," and in June 2016, she "sent Plaintiff copies of [Smithsonian] archival material pertaining to the Artwork."  (Id. ¶¶ 25-26)  Plaintiff alleges that the Hemphill Defendants' post-2016 conduct amounts to fraud because

[65.] . . . HEMPHILL and HFA learned material information regarding the Artwork and converted the Artwork for their own benefit.

66.  Defendants HEMPHILL and HFA failed to disclose to the Plaintiff that they knew the identity of the possessor, had sold the Artwork, and then subsequently consigned it to MNUCHIN.

67.  Defendants HEMPHILL and HFA deliberately and intentionally withheld this material information from the Plaintiff because they knew Plaintiff was asserting a claim of ownership that would interfere with their ability to consign and sell the Artwork on behalf of the possessor.

68.  Defendant HEMPHILL admitted as much when he decided to "come clean" to Plaintiff on September 5, 2019.

(Id. ¶¶ 65-68)

Plaintiff's fraud claim against the Hemphill Defendants is thus premised on their "fail[ure] to disclose" information about the Painting that they acquired at some point before September 2019.  (Id. ¶ 66)  But the Complaint does not plead facts demonstrating that the Hemphill Defendants had a "duty to disclose" to Plaintiff the information she identifies.  The Complaint alleges only that in January 2016, Plaintiff told Mary Early that she had an ownership interest in the Painting; that Early agreed to help Plaintiff search for it; and that Early communicated a lead to Plaintiff in June 2016.  (Id. ¶¶ 25-26)  Early's offer to assist Plaintiff in searching for the Painting did not create a "fiduciary or confidential relationship" between Plaintiff and the Hemphill Defendants, however.  Barrett, 77 A.D.3d at 601-02.  Nor did Plaintiff participate in any transaction with the Hemphill Defendants that could conceivably raise an issue under the "special facts" doctrine.

Because (1) Plaintiff's fraud claim is premised on a material omission rather than an affirmative misstatement; and (2) Plaintiff has not pled facts that would plausibly give rise to a duty to disclose, her fraud claim against Hemphill and HFA will be dismissed under Rule 12(b)(6).

### D.     Unjust Enrichment

The Complaint alleges an unjust enrichment claim against HFA and the Mnuchin Gallery.  (Cmplt. (Dkt. No. 1) ¶¶ 73-75)

#### 1.     Legal Standard

"The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  Paramount Film Distrib. Corp. v. State, 30 N.Y.2d 415, 421 (1972).  "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)

"Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated."  Mandarin Trading, 16 N.Y.3d at 182 (citing Sperry v Crompton Corp., 8 N.Y.3d 204, 215 (2007).  The "relationship between the parties" must be one that "could have caused reliance or inducement."  Id.; see also Joseph P. Carroll Ltd. v. Ping-Shen, 140 A.D.3d 544, 544 (1st Dep't 2016) ("Plaintiff's failure to plead any prior relationship with defendant, let alone one that would cause inducement or reliance, precludes its unjust enrichment claim.").

#### 2.     Analysis

As to the Hemphill Defendants, the Complaint alleges that (1) in January 2016 Plaintiff informed HFA that she had an ownership interest in the Painting, and that an HFA employee offered to assist Plaintiff in her search for the Painting; and (2) in June 2016, the HFA employee sent Plaintiff a lead concerning potentially relevant records.  (Cmplt. (Dkt. No. 1) ¶¶ 25-26)  Plaintiff does not allege that she entered into any agreement or transactions with the Hemphill Defendants.

As to the Mnuchin Gallery, the Complaint alleges that in January 2019, Plaintiff's daughter Erika "relayed [to a representative of the gallery] that her father had taken the Artwork from the family home without her mother's consent and her mother had been looking for the Artwork for many, many years."  (Id. ¶ 31)  Erika "asked if they could work together to find the Artwork but MNUCHIN refused to provide assistance."  (Id. ¶ 32) (emphasis in original).

These contacts between Plaintiff and HFA, and between Plaintiff and Mnuchin, are not sufficient to plausibly allege a relationship that "could have caused reliance or inducement" on Plaintiff's part, see Mandarin Trading, 16 N.Y.3d at 182, such that "it is against equity and good conscience to permit the defendant[s] to retain what is sought to be recovered." Paramount Film Distrib. Corp., 30 N.Y.2d at 421.

Accordingly, Plaintiff's claim of unjust enrichment against HFA and the Mnuchin Gallery will be dismissed pursuant to Rule 12(b)(6).

### E.     Declaratory Judgment

#### 1.     Legal Standard

"[A] request for relief in the form of a declaratory judgment does not by itself establish a case or controversy involving an adjudication of rights."  In re Joint E. & S. Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993) (citing Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–72 (1950)).  "The Declaratory Judgment Act does not expand jurisdiction. Nor does it provide an independent cause of action.  Its operation is procedural only – to provide a form of relief previously unavailable.  Therefore, a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief."  Id. (citations omitted)

2.     **Analysis**

Plaintiff seeks a declaratory judgment that she is "the rightful owner of 50% of all right, title, and interest in the Artwork and is entitled to the immediate possession of the Artwork."  (Cmplt. (Dkt. No. 1) ¶ 48)  Because this Court has concluded that all of Plaintiff's substantive claims fail, her claim for declaratory relief likewise fails.

Accordingly, Plaintiff's cause of action for a declaratory judgment will likewise be dismissed.

## **CONCLUSION**

Defendants' motions to dismiss are granted as set forth above, and the Complaint is dismissed.  Leave to amend is denied, because the Court's laches finding is not subject to cure.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 22, 27, 33), enter judgment, and close this case.

Dated:  New York, New York
        March 16, 2024

                                SO ORDERED.

                                _____
                                Paul G. Gardephe
                                United States District Judge